# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 12-618V
Filed: September 17, 2015
Reissued Redacted: October 13, 2015
To be Published

```
*************************************
J.T.,                                 *
                                      *
        Petitioner,                   *    Respondent's Motion for a Ruling on the
                                      *    Basis for Calculating Lost Earnings Award;
v.                                    *    conceded case; petitioner seeks damages for
                                      *    lost earnings due to Table injury of brachial
SECRETARY OF HEALTH                   *    neuritis after Tdap vaccine; respondent
AND HUMAN SERVICES,                   *    seeks calculation based on history; petitioner
                                      *    seeks calculation based on business he
        Respondent.                   *    hoped to start but for injury; speculation.
                                      *
*************************************
```

Lisa A. Roquemore, Rancho Santa Margarita, CA, for petitioner.
Lisa A. Watts, Washington, DC, for respondent.

**MILLMAN, Special Master**

### RULING ON CALCULATING WAGE LOSS[1]

On September 19, 2012, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine administered on October 1, 2009 caused him neurologic injury. Petitioner was 53 years old when he received the Tdap vaccine. He is now 59 years old.

On February 19, 2010, petitioner went to the Mayo Clinic and neurologist Dr. Rami Massie took a history and performed a physical examination. Med. recs. Ex. 9, at 132. Besides petitioner's brachial plexopathy symptoms, he had diffuse large fiber length dependent peripheral neuropathy in his legs. Id. at 133. Petitioner told Dr. Massie that his legs were almost

---

[1] Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the categories listed above, the special master shall redact such material from public access. On September 28, 2015, petitioner moved to redact this ruling. The undersigned grants petitioner's motion.

more bothersome to him than his arm symptoms.  Id.  Dr. Massie said he did not know the etiology of petitioner's peripheral neuropathy in his legs.  Id.  Dr. Massie thought the most likely explanation for petitioner's peripheral neuropathy in his legs was Crohn's disease because people with Crohn's can get peripheral neuropathy.  Id.  A less likely explanation would be that petitioner has hereditary neuropathy with liability to pressure palsies ("HNPP").  Id.

      Prior to receiving the Tdap vaccine on October 1, 2009, petitioner had numerous medical conditions, according to a medical history petitioner gave to Dr. Peter B. Dyck, neurologist, at the Mayo Clinic on May 16, 2011.  Med. recs. Ex. 9, at 66.  He had Crohn's disease in 2009, and developed Crohn's arthritis in March 2011.  Id.  He had prostate cancer in April 2010 followed by a prostatectomy.  Id.  In 2001, petitioner developed back and shoulder pain which radiated into his arm, forearm, and hand.  Id.  After four to six weeks, he developed atrophy in his anterior forearm and noticed weakness with wrist extension, wrist flexion, and grip.  Id.  At the same time in 2001, he noticed prickling and tingling in the soles of his feet, which he still had at the time of this visit 10 years later.  Id.  Petitioner then developed tingling in his upper back, thoracic region, and shoulder, mostly in the morning.  Id.  He was found to have a T5 through T8 thoracic syrinx.[2]  Id.  Shortly afterward, his Crohn disease became active and he lost 50 pounds and did not do much work.  Id.  Dr. Dyck summed up petitioner's experience post-Tdap by stating that he believed petitioner had two episodes of inflammatory brachial plexopathy occurring on both sides separated by about 10 years.  Id. at 67.  He considered them to be monophasic illnesses with an active inflammatory component and then gradual improvement that was often fairly mild.  Id.  At the time Dr. Dyck examined petitioner on May 16, 2011, he did not think petitioner had an inflammatory neuropathy present and did not recommend specific treatment with immunomodulating therapy for his neuropathy.  Id.

      On December 10, 2012, the undersigned held a telephonic status conference with the parties to discuss the case, suggesting settlement, and ordering petitioner to make a demand on respondent by February 1, 2013.  (At that time, Conway, Homer & Chin-Caplan, P.C. represented petitioner.)  Order dated December 10, 2012.

      On December 18, 2012, respondent filed her Rule 4(c) Report conceding entitlement, i.e., that the Tdap vaccine caused petitioner's left brachial neuritis, a Table injury.  Resp't's Rep. at 6-7.

      On February 1, 2013, petitioner filed a status report which was in reality a motion for an extension of time within which to make a demand because petitioner had scheduled an on-sitevisit and wanted until April 19, 2013 to make a demand on respondent.

      On February 4, 2013, the undersigned issued an Order interpreting petitioner's "status report" as a motion for an extension of time, and granted it.  The undersigned ordered petitioner to make a demand on respondent by April 19, 2013, and rescheduled a previously scheduled telephonic status conference from February 15, 2013 to May 2, 2013.

---

[2] A syrinx is an abnormal cavity in the spinal cord.  Dorland's Illustrated Medical Dictionary 1858 (32d ed. 2012).

2

On April 22, 2013, three days after petitioner was to have made a demand on respondent, petitioner filed a second "status report" which was in reality a motion for an extension of time within which to make a demand because petitioner's life care planner was still working on a life care plan and petitioner was compiling information on lost wages and out-of-pocket expenses. Petitioner had moved from Iowa to California, but his documentation of out-of-pocket expenses remained in Iowa. His wife was going to travel to Iowa in May. Petitioner anticipated making a demand on respondent by June 12, 2013.

On April 22, 2013, the undersigned issued an Order interpreting petitioner's second "status report" as a motion for an extension of time, and granted it. The undersigned ordered petitioner to make a demand on respondent by June 12, 2013, and rescheduled the previously scheduled telephonic status conference from May 2, 2013 to July 11, 2013.

On June 12, 2013, petitioner filed a status report and motion for an extension of time. Petitioner's life care planner was finalizing petitioner's life care plan, and anticipated the life care plan would be completed by July 19, 2013. In addition, petitioner continued to compile and itemize information regarding lost wages and out-of-pocket expenses. Petitioner anticipated making a demand on respondent by August 9, 2013.

On June 13, 2013, the undersigned issued an Order granting petitioner's motion for an extension of time. The undersigned ordered petitioner to make a demand on respondent by August 9, 2013, and rescheduled the previously scheduled telephonic status conference from July 11, 2013 to August 26, 2013.

On August 8, 2013, petitioner filed his fourth "status report" which was in reality a motion for an extension of time within which to make a demand because petitioner's life care planner had not yet finalized her life care plan, but anticipated doing so in the next two weeks. In addition, petitioner continued to work toward preparing an accurate demand for lost wages. Petitioner anticipated making a demand on respondent by September 12, 2013.

On August 9, 2013, the undersigned issued an Order interpreting petitioner's fourth "status report" as a motion for an extension of time, and granted it. The undersigned ordered petitioner to make a demand by September 12, 2013, and rescheduled the previously scheduled telephonic status conference from August 26, 2013 to October 1, 2013.

On September 12, 2013, petitioner filed his fifth status report, stating that he made a demand on respondent on September 12, 2013, ten months after the first status conference in this case, and also noting that he was looking for alternate counsel to represent him.

On September 24, 2013, respondent filed a stipulation for interim attorneys' fees and costs for the Conway, Homer & Chin-Caplan, P.C., firm for $42,170.12 in attorneys' fees and costs, based upon which the undersigned issued an Interim Attorneys' Fees and Costs decision awarding $42,170.12. Judgment entered on October 2, 2013.

3

On September 30, 2013, by non-PDF Order, the undersigned rescheduled the October 1, 2013 telephonic status conference to October 31, 2013.

On October 7, 2013, petitioner filed a Motion to Substitute or Change Attorney of Record, which petitioner's current counsel, Lisa A. Roquemore, signed.

On October 31, 2013, the undersigned held a telephonic status conference with counsel. Petitioner's counsel stated she was reviewing the files and attempted to reach petitioner's life care planner, but she was out of the country. She stated she retained an economist to determine lost wages and lost opportunity. Respondent requested insurance information (petitioner was insured through his wife's employer) and the disability policy which paid petitioner through Mercy Medical Center. The onsite visit was conducted on March 12, 2013.

On November 11, 2013, petitioner filed medical records from the Mayo Clinic as Exhibit 17. The first record, dated July 22, 2013, recounts a visit with a speech pathologist, to evaluate petitioner's voice. Dr. Diana M. Orbelo (Ph.D.) notes that petitioner was unable to perform long-term speaking. Med. recs. Ex. 17, at 1. He still could not sing. Id. On physical examination, petitioner was mildly hoarse. Id.

The second record in Exhibit 17, dated July 23, 2013, recounts a visit with an internist, Dr. Paul S. Mueller. Id. at 7. Dr. Mueller recounts petitioner's brachial neuropathy (Parsonage-Turner syndrome), and petitioner's and his wife's move from Iowa to California where there were better school options for their children with special needs. Id. Petitioner also had erectile dysfunction and urologic concerns, particularly nocturnal incontinence. Id. Dr. Frank had petitioner change his Cialis to Viagra, particularly because of the headaches, but he was aware that Viagra can also cause headaches. Id. Petitioner complained about Crohn's disease which his brother also has with fistula which had not yet occurred in petitioner. Id. Petitioner also complained of shoulder pain which was due to arthritis, revealed on x-ray. Id. He complained of pain due to his Parsonage-Turner syndrome taking the form of episodic bilateral back spasms. Id. Petitioner had a history of prostate cancer for which he had a prostatectomy. Id. at 9. He also had a history of transient global amnesia and malignant melanoma. Id.

The third record in Exhibit 17, dated July 24, 2013, recounts a visit with a sports medicine consultant, Dr. Jay Smith, to deal with petitioner's right shoulder pain. Id. at 15. Dr. Smith did a full physical examination of petitioner and found "there is no clear explanation for the extent of mechanical symptoms he is having." Id. at 16. Dr. Smith had a long discussion with petitioner and his wife, saying "I am uncomfortable attributing the extent of his symptoms to what I am seeing with his rotator cuff." Id. He recommended an MRI of the shoulder. Id. Dr. Smith wanted to find out if petitioner has abnormal glenohumeral kinematics. Id. On that same date, Dr. Smith did an ultrasound of petitioner's right shoulder and discovered the glenohumeral joint was normal. Id. at 18. He found a probable small partial articular-sided supraspinatus rotator cuff tear versus high-grade tendinosis as well as thickening of the anterior bicipital sling possibly suggestive of rotator interval injury. Id. at 19.

The fourth record in Exhibit 17, dated July 24, 2013, recounts a visit with a neurologist, Dr. Eduardo E. Benarroch, regarding petitioner's brachial plexopathy. Id. at 20. Petitioner also complained of left toe numbness and mild sensorimotor peripheral neuropathy. Id. at 20-21. He has bilateral high arches which his mother also has, suggesting a hereditary peripheral neuropathy. Id. at 21. No clear cause for his dysphonia was found. Id. Dr. Benarroch's conclusion was that the right shoulder pain was very unlikely to be a manifestation of exacerbated brachial plexopathy because the right deltoid reflex was stronger than the one on the left, and the right biceps and right brachioradialis reflexes were stronger than those on the left. Id. at 22-23. Dr. Benarroch diagnosed petitioner's sensorimotor peripheral neuropathy as probably hereditary. Id. at 23. Dr. Benarroch also diagnosed petitioner with mild venous incompetence in the lower extremities consistent with his symptoms beginning after a long plane ride and repetitive movement of the left foot producing mild cyanotic discoloration of the foot in association with improvement of his sensory symptoms. Id.

On January 17, 2014, the undersigned held a telephonic status conference with counsel. Petitioner's counsel stated that petitioner and his wife had lost confidence in their life care planner and switched to a different life care planner. Petitioner's counsel said she would make a demand for pain and suffering on respondent, but had not yet calculated economic loss and unreimbursable past medical expenses.

On March 4, 2014, petitioner filed a status report stating he had made a demand for pain and suffering on January 21, 2014. Status Rep. at 1. On February 25, 2014, respondent made a counteroffer on pain and suffering. Id. at 2. Petitioner was reviewing the counteroffer and also seeking consultations with physicians regarding his future needs. Id. Petitioner was still working on the following: past unreimbursable medical expenses, a lost wages analysis, and his Social Security earning history which respondent had requested. Id. Petitioner's counsel asked for an extension of time within this status report to change the status conference from March 18, 2014 until 60 days later or approximately May 19, 2014. Id.

On March 5, 2014, interpreting part of petitioner's status report as a motion for an extension of time, the undersigned granted it and rescheduled the telephonic status conference from March 18, 2014 to May 20, 2014.

On May 20, 2014, the undersigned held a telephonic status conference with counsel. Petitioner's counsel stated the parties were close to settling an amount for pain and suffering. She sent the unreimbursable medical expense information to respondent's counsel the prior week and hoped to send petitioner's life care plan to respondent's counsel by May 23, 2014. Petitioner's counsel still needed to obtain lost wages information and was meeting an expert for that purpose. Petitioner had ordered his Social Security earning history. He applied for Social Security Disability Insurance ("SSDI") one to two months previously. The next telephonic status conference was set for June 19, 2014.

On June 19, 2014, the undersigned held a telephonic status conference with counsel. Petitioner's counsel said the parties had made progress. Respondent was examining petitioner's

out-of-pocket expenses. Petitioner's counsel sent petitioner's life care plan to respondent and the parties' life care planners were going to meet to discuss it. She had received the lost wages information on June 18, 2014, and stated she would file it. Respondent's counsel stated she needed a business evaluation expert, but asked for the undersigned's input first. Petitioner was earning money by doing physical therapy at a hospital, but his lost wages demand reflected his hopes for the new career he wanted to have which was his own physical therapy business. He already had a seminar business, but petitioner stated he can no longer gave seminars. The undersigned asked petitioner's counsel to file the lost earnings material and then set a new telephonic status conference for August 22, 2014.

After the telephonic status conference, on June 19, 2014, petitioner filed Exhibit 25, the expert report of economist Brad Johnson, estimating lost economic value at $11,614,677.00. Ex. 25, at 5. That figure was derived from the purported present value of physical therapy income of $9,275,940.00, purported present value from the sale of the anticipated physical therapy practice of $1,015,244.00, purported present value of seminar income of $1,069,345.00, and purported present value from the sale of petitioner's seminar business of $254,148.00. Id. Mr. Johnson based the over $11 million for lost economic value on what petitioner hoped his proposed physical therapy company would earn ("PT Plan") and what his seminar and speaking engagement business ("Seminar Plan") would earn, buttressed by the opinions of others who knew petitioner and estimated he would have earned had he been able to start a physical therapy business and continue speaking at seminars. Id. at 2. Attached to Exhibit 25 are seven exhibits marked as Exhibits 26-32.[3]

On August 20, 2014, petitioner filed his SSDI package, including the statement of his conditions: neuralgic amyotrophy, bilateral carpal tunnel syndrome, torn right rotator cuff (right hand dominant), Crohn's disease, prostate cancer (in remission), malignant melanoma (in

---

[3] In 2009, the year petitioner had his vaccine injury, petitioner had an adjusted gross income of $96,469.00, and a taxable income of $61,698.00. Ex. 77, at 1, 2. He had a $2,456.00 loss from his unspecified business. Id. at 4. In 2008, the year before petitioner had his vaccine injury, petitioner had an adjusted gross income of $118,014.00, and a taxable income of $91,347.00. Ex. 76, at 1, 2. He had a $1,909.00 profit from his business. Id. at 3. In 2007, petitioner had an adjusted gross income as a physical therapist of $162,208.00, and a taxable income of $136,276.00. Ex. 75, at 1, 2. He had an $8,951.00 loss from his business. Id. at 4. In 2006, petitioner had an adjusted gross income of $189,300.00, and a taxable income of $167,003.00. Ex. 74, at 1, 2. He had a $6,617.00 profit from his business. Id. at 4. In 2005, petitioner had an adjusted gross income of $184,760.00, and a taxable income of $162,085.00. Ex. 73, at 1, 2. He had a $3,803.00 loss from his business. Id. at 4. In 2004, petitioner had an adjusted gross income of $196,725.00, and a taxable income of $175,502.00. Ex. 72, at 1, 2. He had a $1,788.00 profit from his business. Id. at 4. In 2003, petitioner had an adjusted gross income of $167,350.00, and taxable income of $143,419.00. Ex. 71, at 1, 2. He had a $10,646.00 loss from his business. Id. at 4. In 2002, petitioner had an adjusted gross income of $191,653.00, and a taxable income of $167,417.00. Ex. 70, at 1, 2. He had a $1,477.00 profit from his business. Id. at 4. In 2011, petitioner had an adjusted gross income of $146,958.00, and a taxable income of $123,026. Ex. 69, at 1, 2. He had a $2,719.00 loss from his business. Id. at 4. In 2000, petitioner had an adjusted gross income of $128,120.00, and a taxable income of $102,991.00. Ex. 68, at 1, 3. He had a $4,401.00 loss from his business. Id. at 5. Petitioner did not file a copy of his 1999 and 1998 tax returns. In 1997, petitioner had an adjusted gross income of $149,990.00, and a taxable income of $141,269.00 as an employee of Physiotherapy Associates. Ex. 67, at 1, 3. He had a $27,800.00 profit from his business. Id. at 5. In 1996, petitioner had an adjusted gross income of $102,630.00, and a taxable income of $93,551.00. Ex. 66, at 1, 2. He had a $16,183.00 profit from his business. Id. at 4.

remission), arthritis, and anxiety. Med. recs. Ex. 56, at 8. He stated he stopped working on March 17, 2010, which is six months after the onset of his brachial neuropathy. Id. at 25. He described his prior employment as physical therapist/director of sports medicine and stated he earned $105,000.00 per year. Id. at 25.

On August 22, 2014, the undersigned held a telephonic status conference with counsel. Petitioner's counsel said that tax returns had been requested and the life care planners were speaking with two doctors. Respondent's counsel requested more documentation of petitioner's claimed past unreimbursable medical expenses.

On October 15, 2014, respondent filed as Exhibit A her preliminary calculation of petitioner's lost earnings. The discounted present value from 2009 to 2023 was $582,477.29. Ex. A, at 2.

Since then, the parties have been engaged in an attempt to settle damages. The one barrier to settlement is the calculation of petitioner's earning loss. Petitioner hoped to start his own physical therapy business and calculates the business would have earned him $11 million in earnings loss. Respondent based her calculation of petitioner's earning loss on his pre-vaccination earnings as an employee and participant in physical therapy seminars, which comes to less than $1 million. With this $10 million difference between the parties, respondent moved for the undersigned to rule on the basis for calculating petitioner's lost earnings, i.e., whether to award damages based on his aspirations or on his known historical wages. Respondent emphasized that petitioner's Exhibit 25 was a valuation report focusing on a business that was never a going concern, and that petitioner's business plan (Exhibit 27, at 9) was written long after his vaccine injury. In an Order of the same date, the undersigned set a deadline of November 13, 2014 for petitioner to file a motion or memorandum summarizing his argument for future lost wages and the legal basis for justifying such an award. Respondent's response was due January 5, 2015 with petitioner's reply due February 4, 2015. The undersigned scheduled the next telephonic status conference for October 7, 2014.

At the request of the parties, the status conference was moved to October 9, 2014. On October 9, 2014, the undersigned held a telephonic status conference with counsel. Petitioner's counsel said that petitioner had a start date to receive SSDI. His Medicare coverage would become retroactive to December 2013 once he obtained it in December 2015. Petitioner had filed his tax returns, but the life care planners still wanted to speak to his doctors. Petitioner was trying to separate his unreimbursable past medical expenses for his prostate cancer treatment from his shoulder injury treatment. Petitioner has two special needs children for which people come into the home to provide services. Petitioner's economic loss expert report reflects the view that petitioner would have sold his business at some point, in consideration of the fact that he was 53 years old when he was injured. In an Order dated the same date, the undersigned also mentioned that petitioner and his wife moved to California in 2013 because there was a special school there for children with Fragile X syndrome. Therefore, petitioner's economic loss valuation should reflect his move from Iowa to California. The undersigned scheduled the next telephonic status conference for January 12, 2015.

On January 7, 2015, petitioner filed his declaration as Exhibit 58, stating he would not have moved from Iowa to northern California if he did not have a vaccine injury (even though he and his wife placed the elder son in a special private school in northern California because he could not transition from middle school to high school in Iowa). Ex. 58, at 1-3.

On January 12, 2015, the undersigned held a telephonic status conference with counsel. Petitioner's counsel stated that petitioner and his economist were going to meet that week, and the information from Heather Schellhorn and Rebecca Carver, two people with whom petitioner was going to contract to work for him at his proposed physical therapy business, should be produced regarding what their salary would have been and what net income petitioner would have had from reducing their salary from his anticipated profits. Marek Wensel's data was already filed as Exhibit 60 (Mr. Wensel was another prospective employee with whom petitioner was going to contract). Petitioner's counsel explained that she was still obtaining information regarding petitioner's unreimbursable past medical expenses minus the payments made for his prostate cancer. Respondent's counsel described petitioner as a professional in midlife with a defined earnings history. She could not find a basis to engage in speculation about whether petitioner would have succeeded if he had his own business. Petitioner had significant past earnings. Petitioner's counsel said petitioner's economic evaluation of wage loss included a discount for speculative factors, including the high risk of failure. In an Order dated January 12, 2015, the undersigned ordered petitioner to file a status report with the exhibit number and page numbers of the economist's formula for this calculation of a discount for speculative factors. Petitioner was ordered to file such calculation if petitioner's economist did not explain this calculation.. (In a subsequent filing, petitioner stated his economic expert reflected the speculative nature of his figures for economic impairment by using a 12% discount rate.)

On March 25, 2015, the undersigned held a telephonic status conference with counsel. Petitioner's counsel said that petitioner wanted $250,000.00 as a sales price for his seminar business. Respondent's counsel noted Dr. Utz's statement in December 2013 that petitioner could return to work (Ex. 22). Respondent's counsel also stated that petitioner assumed he would make a $240,000.00 profit in the first year of his proposed physical therapy business. His earnings as a physical therapist in a hospital were $100,000.00. In an Order of the same date, the undersigned ordered respondent to file a motion for a ruling on lost wages by May 26, 2015, with petitioner's response due July 27, 2015, and respondent's reply due August 26, 2015. The undersigned scheduled the next telephonic status conference for September 1, 2015.

The undersigned **GRANTS** respondent's motion for a ruling on the basis for calculating petitioner's lost earnings award. Petitioner wants compensation for a business he never had, which has no prior earnings history, and where the income which he hoped to have was based not only on his own efforts, but on those of others with whom he intended to contract for services. Moreover, petitioner's valuation of his economic loss includes a proposed selling price for the business he never had, which presumes not only what petitioner's net income would have been had he started and developed this business, but also what a prospective buyer would have paid for this business at some point in the future. This is not a case of someone training in

college to take a salaried position as a teacher who, having become disabled, can no longer earn the known salary of that position. Legally, the undersigned cannot award speculative damages. In essence, petitioner has picked an $11 million lost economic value based on hope. The undersigned finds that expectation based on speculation. However, since petitioner stated he intended to work until age 70, the undersigned holds that respondent's calculations should be modified from an approximate 67-year work life expectancy to a 70-year work life expectancy. Respondent receives an offset for the disability payments to petitioner as well as for Medicare payments to petitioner under 42 U.S.C. § 300aa-15(g).

The statutory provision, 42 U.S.C. § 300aa-15(a)(3)(A), stating petitioner may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections" does not envision that "anticipated loss of earnings" includes speculation. Moreover, using a very high discount rate of 12% does not cure the speculative nature of the assessment of future economic impairment. It is important to distinguish the loss of earning capacity evaluation for someone over 18 for whom "actual and anticipated loss of earnings" may be determined more concretely than for someone under 18 who does not have an earnings history. The language of §15(a)(3)(B) for vaccinees under the age of 18 predicates the determination of "impaired earning capacity" on the "average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy . . . ."

Tembenis v. Secretary of Health and Human Services, No. 03-2820V, 2011 WL 5825157, at *4 n.5, *5 (Fed. Cl. Spec. Mstr. Oct. 26, 2011), aff'd, 2012 WL 5395405 (Fed. Cl. Oct. 19, 2012), rev'd, 733 F.3d 1190, 1195 (Fed. Cir. 2013); and Stotts v. Secretary of Health and Human Services, 23 Cl. Ct. 352, 366 n.13 (1991), are informative for the principle that impairment of earning capacity is compensable even though there are no actual lost earnings when the vaccinee is a minor (as in Stotts), but is inappropriate when the minor vaccinee has died (as in Tembenis). One would think that if impairment of earning capacity, regardless of actual past earnings, were a sufficient criterion for awarding wage loss, the Federal Circuit would have recognized that in Tembenis and affirmed the award to the dead minor's parents. The only conclusion one can draw from the Tembenis decision is that where circumstances would not envision lost wages, i.e., when a child dies, no award for lost future wages is permissible. Similarly, when the vaccinee is an adult, if circumstances (i.e., injury before engaging for the first time in a business venture) do not permit a reasonable basis for an award of lost earnings, then only the actual wages the vaccinee earned as an employee constitute a reasonable basis for a lost wages award.

On September 1, 2015, the undersigned held a telephonic status conference with counsel to inform them of how the undersigned was going to rule on respondent's motion for a ruling on the basis for calculating petitioner's lost earnings award and stated the undersigned would issue the written ruling within two weeks of the status conference. See Order of September 1, 2015. The undersigned advised the parties during the status conference to work on resolving damages, and set another status conference for October 19, 2015. Id.

9

On September 8, 2015, petitioner's counsel filed transcripts from another case in which she represented a different petitioner before a different special master in which earnings loss was an issue. The result of the hearing was respondent's proffer of damages, upon which the other special master relied in issuing a damages decision dated September 10, 2007. Also on September 8, 2015, petitioner filed a status report regarding the transcripts he filed from this other petitioner's hearing, stating, "Petitioner acknowledges that such ruling has zero precedential value; but it does indicate how other Special Masters have ruled in the past and wanted this Court to have this information." Pet'r's status rep., at 2.

Petitioner is correct that the information revealed in another petitioner's hearing has zero precedential value, but the rest of that statement is wrong and misleading. Firstly, there was no ruling on the issue. Respondent in the other case settled with petitioner and then filed a proffer. The special master merely awarded the damages to which the parties agreed. He did not issue a ruling interpreting how future earnings loss in that case should be calculated. Moreover, there were no other special masters "ruling" on this issue, although petitioner states in his status report that this non-existent ruling "does indicate how other Special Masters have ruled in the past. . . ." Id.

Even arguendo if the other special master had issued a ruling on the issue of earnings loss, his opinion would not bind the undersigned to follow his decision. Hanlon v. Sec'y of HHS, 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999) (special masters are not bound by their own or other special masters' decisions or those of the U.S. Court of Federal Claims except in the same case).

On September 9, 2015, the undersigned issued an Order striking petitioner's Exhibit 103, the transcripts of the hearing in the other case, because petitioner violated 42 U.S.C. § 300aa-12(d)(4) (2015), in filing them in this case without the other petitioner's express written consent.

## MOTION AND FILINGS

On May 21, 2015, respondent filed her Motion for a Ruling on the Basis for Calculating Petitioner's Lost Earnings Award, together with respondent's Exhibit B. Respondent updated her calculation of economic loss to $628,031.08 consisting of past lost earnings of $201,689.35 (assuming judgment enters in 2015), and future lost earnings of $426,341.73. Resp't's Mot., at 7. This assumes a base earnings capacity starting in 2009 of $114,000.00 yearly pre-tax, offset by reported earnings and group disability insurance payments. Ex. B, at 2. Estimated work life expectancy was 13.51 years. Id. Respondent used a net discount rate for future earnings of either 1.5% or 1.6%. Id. Respondent increased petitioner's previous annual earnings from $105,000.00 to $114,000.00 by including income from petitioner's seminar and speaking engagement business, even though petitioner reported a profit from his business for only half the years from 1996 to 2012. Resp't's Mot. at 8. Respondent notes that petitioner's earnings placed him in the top 90% of physical therapists. Id. at 9. Respondent also notes that approximately 25% of new businesses fail within the first year, while approximately 50% of new businesses fail

10

within the first five years.  Id.

Respondent states that petitioner's Seminar Plan (Ex. 28) envisions an after tax net profit of $47,860.00 in 2010, even though he had a loss of $2,456.00 in 2009, and a meager $1,909.00 profit in 2008.  Id. at 10.  Petitioner also described in his physical therapy business plan a net profit of $243,180.00 (an 18.1% profit margin) in 2010, the first year of its operation, which would grow to $774,759.99 by 2014.  Id.  Respondent notes that petitioner's physical therapy business plan specified that patient-care would not be Medicare-based, excluding a significant Iowa population from its customers.  Id. at n.14.  Respondent also notes that petitioner's economic expert estimated petitioner would have an operating profit before taxes of $460,000.00 in the first year of the business's operation, growing to a $1,675,949.00 pre-tax operating profit to petitioner by 2014.  Id. at 10 (citing Ex. 25, at 5).

Respondent concludes by noting that at the time petitioner had an adverse reaction to his vaccination, he did not have a business plan to start his own physical therapy business, he had not secured financing to start this business, he had not leased space for this new business, he did not have a business tax ID for his proposed business, he did not have a business bank account for this new business, he had not purchased or leased equipment for this new business, and he had not hired a single employee.  Resp't's Mot. at 10.   In other words, this new business was not in existence when petitioner was injured.  Id.

On July 23, 2015, petitioner filed Exhibits 90 to 97 in support of his Response to Respondent's Motion for a Ruling on the Basis for Calculating Petitioner's Lost Earnings Award.  In Exhibit 90, petitioner declares that in 1995, as the clinic manager for Iowa Orthopedic and Sports Therapy (Physiotherapy Associates), he turned a money-losing business into a profitable business, making it a multimillion dollar enterprise and opening four satellite locations.  Ex. 90, at 2.  It became the most profitable of 500 clinics in the country.  Id.  He said his plan to open his own physical therapy business began before he had his vaccine injury, but it was on separate pieces of paper and he did not need a formal plan for the startup because it would have modest costs.  Id. at 3.  He stated that he decided not to obtain third-party financing for his prospective business because he had more than adequate assets within his investment accounts for the very modest financial needs of his startup model, citing to Exhibit 94.  Id.

Also, on July 23, 2015, petitioner filed Exhibits 98 to 101 in support of his Response to Respondent's Motion for a Ruling on the Basis for Calculating Petitioner's Lost Earnings Award.  These consist of declarations of others that petitioner would have succeeded in his planned business.

On July 23, 2015, petitioner also filed a 32-page brief entitled Petitioner's Response to Respondent's Motion for a Ruling on the Basis for Calculating Petitioner's Lost Earnings Award.  The brief explained that four others who had their own physical therapy businesses told petitioner to start small.  Pet'r's Resp. at 3.  These four individuals discouraged petitioner from pursuing his initial business model.  Id.

11

On August 24, 2015, respondent filed her Reply and Renewed Motion for a Ruling on the Basis for Calculating Petitioner's Lost Earnings Award under the Vaccine Act, reiterating her points in her earlier Motion, and stating that she calculated lost wages on an almost 67-year work life expectancy, rather than petitioner's intended 70-year work life expectancy. Resp't's Reply, at 6. Respondent's calculation of petitioner's wage loss also includes an offset for petitioner's receipt of disability payments, per 42 U.S.C. § 15(g):

> Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or reasonably be expected to be made, with respect to such item or service (1) under any State compensation program, under an insurance policy, or under any Federal or State health benefits program . . . .

Payments made to petitioner for disability qualify as an offset under this provision ("under an insurance policy") and payments under Medicare qualify as an offset as well ("under any Federal . . . health benefits program"). Id.

**DISCUSSION**

The undersigned does not impute ill intent to either petitioner or his many supporters, all of whom say that if he had only begun his own physical therapy business, he would have succeeded. However, the undersigned cannot award damages based on speculation. There is no such thing as guaranteed income or even likely income when one starts a new business. The undersigned finds interesting that petitioner states he planned to have modest costs for starting his business in 2010, yet his economic expert views the first year of petitioner's fledgling business as yielding a quarter-million dollars in profit. Ex. 90, at 3. This is not a credible statement. Furthermore, although petitioner successfully worked as a manager for Physiotherapy Associates, his projected new physical therapy business would have been in competition with the physical therapy business he had built up for Physiotherapy Associates as well as with other already-existing physical therapy businesses. An economic pie split in pieces is less than the whole.

Petitioner sought advice from four physical therapy business owners who told him to start small. How does starting small generate a quarter-million dollar first-year profit? When he began managing Physiotherapy Associates, it was already an established business.

According to the Restatement of Torts, "[b]ecause of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business. (See Illustration 12)." Restatement (Second) of Torts § 912 cmt. d (1979). Illustration 12 states:

> 12. A pays B $10,000 for a license to sell in specified territory a new drink, produced and extensively advertised by B. Before a

> shipment has been made, C tortiously causes B to refuse to make
> delivery. A is not entitled to substantial damages from C on proof
> that the gross profit would have been 20 per cent., that other drinks
> have had a ready sale in the same locality, that in other localities
> large quantities of the same drink have been sold, and that in the
> past A has been successful in other enterprises.

Petitioner cites Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983), as having "critical significance to the instant case." Pet'r's Resp. at 9. In Jones & Laughlin, the United States Supreme Court states, in the context of longshore worker wages when a longshore worker slipped and fell on snow and ice left on a deck, "In calculating damages, it is assumed that if the injured party had not been disabled, he would have continued to work, and to receive wages at periodic intervals until retirement, disability, or death." Id. at 533. "The most obvious and most appropriate place to begin is with the worker's annual wage at the time of injury." Id. at 534. This annual wage may be enhanced by foreseeable promotions and productivity growth within the worker's industry. Id. at 536. The bulk of the Supreme Court's opinion is devoted to a discussion of how to value the rate of inflation in arriving at a figure to compensate plaintiff. It is in the context of valuing inflation that the Supreme Court said, "Because the lost stream can never be predicted with complete confidence, any lump sum represents only a 'rough and ready' effort to put the plaintiff in the position he would have been in had he not been injured." Id. at 546. This statement in the context of determining inflation in compensating a salaried employee was not a license to engage in speculation in the context of what profits a non-existent business would have made in future, as is the issue in the instant action. Another difference is the nature of the longshore industry, which the Supreme Court called "relatively stable and predictable," noting that the plaintiff's wages were determined by a collective bargaining agreement explicitly providing for cost of living increases. Id. at 552. In contrast, petitioner's field in the instant action involves a physical therapy business which, had it ever existed, would have had competition from other physical therapy businesses, including his former employer's business. Instead of predictable wages, petitioner was gambling on generating enough business, while employing people to work under him, to generate a net profit for himself. Petitioner's aspirations are far removed from the settled wage loss in the Jones & Laughlin case.

Petitioner cites with approval to former Special Master Richard Abell's decision in Brown v. Secretary of Health and Human Services, No. 00-182V, 2005 WL 2659073 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). Pet'r's Resp. at 9, 19. Special Master Abell conducted a damages hearing after ruling that tetanus toxoid vaccine caused petitioner chronic inflammatory demyelinating polyneuropathy ("CIDP"). Id. at *1. Petitioner was an employee of Highwaymaster which became @Track Communications in 2000, then Aether Systems in 2002, and then Slingshot Acquisition Corporation in 2004. Id. at *5, n.6. Because of petitioner's CIDP, his employer terminated him. Id. at *5. Although Special Master Abell recognized that petitioner was "being groomed for upper management . . . [and] this vaccine-related injury derailed the meteoric rise of a talented young executive," he said an award of lost earnings should be calculated in a "cautious manner." Id. at *6. Recognizing that petitioner's

13

employer was about to promote petitioner to a valuable position in the company as vice-president, but due to his vaccine injury petitioner was demoted instead, Special Master Abell awarded petitioner what he could have earned as vice-president of the company. Id. at *7.

Mr. Brown's position as a valued employee in a company set to promote him to vice-president contrasts markedly with petitioner's position in the instant action. Whereas the salary Mr. Brown could have had if not for the vaccine injury was readily known and his promotion certain, petitioner herein was going to launch a business venture from which he would earn nothing if it were not profitable. There was no known net profit for him and this unknown would extend to his entire work life as an entrepreneur. Further unknowns are the sales prices for this proposed business venture and for petitioner's seminar and speaking engagement business, the latter of which, even before the vaccine injury, resulted in losses as often as gains, depending on the tax year.

Petitioner further cites with approval Connolly v. Pre-Mixed Concrete Co., 49 Cal.2d 484, 319 P.2d 343 (1957), concerning a 20-year-old amateur tennis player on the verge of going professional, who was thrown from a horse that a cement mixer truck frightened. Pet'r's Resp. at 10. A jury awarded her $95,000.00 and the company that owned the cement mixer truck appealed to the Supreme Court of California, which affirmed the jury's award because it was not so disproportionate to any reasonable limit of compensation as to indicate passion, prejudice or corruption on the jury's part. Id. at *488, *345. Plaintiff was the National Junior Girls Singles Tennis champion at the ages of 14 and 15. Id. at *488, *345-46. She won the National Women's Singles Title three times and was preparing to compete a fourth time. Id. at *488, *346. For three successive years, she won at Wimbledon, and, the year before her accident, she won the French, Australian, and United States championships, winning the four major tennis championships in the world. Id. She was twice named Woman Athlete of the Year in a newspaper poll. Id. The accident occurred in July 1954, and it was plaintiff's intent to participate in the United States championship tournament and then turn professional in October 1954. Id. She planned to go on a three-month professional tennis tour for which she had been offered a percentage of the receipts, with a guarantee of $30,000.00. Id. She would have received $62,500.00 if the tour had continued outside the United States, and she would have received additional money from endorsements of sporting goods and other articles, clearing $50,000.00 during that year. Id. Other witnesses estimated her first-year earnings as a professional at $75,000.00. Id. at *488-89, *346. Evidence showed she could expect at least seven or eight years as a professional were it not for her injury. Id. at *489, *346. In light of this evidence, the court affirmed the award. Id.

Contrast petitioner in the instant action with Ms. Connolly's proven track record of being the best women's tennis player in numerous national and international competitions. It is beyond dispute that she would have succeeded as a professional tennis player because of her past success. There can be only one champion in a competition. The certainty of her success had she not been injured is reflected in the contractual offer of a percentage of receipts once she turned professional with a guarantee of $30,000.00, which in 1954 would have been considered real money. Moreover, the earnings of tennis professionals over the next seven or eight years

were not in dispute. Petitioner in the instant action had no guarantee of a net profit from starting his own physical therapy business. The vagaries of the business environment, his success depending upon the achievements of his employees and not just his own skills, and the competition from other physical therapy companies necessitate guessing not only whether his physical therapy business would have succeeded at all, but also what amount of money he would receive each year in net profit once he had paid his employees' salaries and the other costs of running a business. Further speculation in the instant action surrounds the selling prices of this putatively successful enterprise and of his seminar and speaking engagement business which, in the past, had not been uniformly profitable.

Petitioner also cites with approval Gargir v. B'nei Akiva, 66 Cal.App. 4th 1269, 78 Cal. Reptr. 2d 557 (1998), which concerned the propriety of jury instructions in a personal injury action during which plaintiff, a first-time skier, fell down and suffered a knee injury. Pet'r's Resp. at 11. Plaintiff was 16 years old. Id. at *1273. The jury found that plaintiff's damages were $1.2 million, but since she was 50 percent negligent, the jury awarded her $600,000.00. Id. at *1274. The court stated, regarding impairment of the power to work, that the test is not what plaintiff would have earned, but what she could have earned. Id. at *1280. The court emphasized that this principle was particularly applicable when plaintiff was a student or an apprentice. Id. The court cited a case, Lang v. Barry, 71 Cal. App. 2d 121, 161 P.2d 949 (1945), in which, at the time of plaintiff's injury, plaintiff was a 16-year-old part-time gas station attendant. 71 Cal.App.2d at *123. His injury disqualified him from entering the regular military, permitting only limited service as a specialist. Id. at *126. The court found estimating the impairment of the minor plaintiff's earning power a proper consideration for the jury. Id. at *126-27. In Gargir, plaintiff intended to pursue a career teaching young children with mental or physical disabilities, a job entailing physical dexterity and mobility. 78 Cal. Rptr. 2d at *1282. Plaintiff's knee injury and her possible future surgeries impaired her ability to follow her chosen career. Id. The court affirmed the jury's verdict. Both Ms. Gargir's and Mr. Lang's situations are vastly different from petitioner's circumstances in the instant action. Both Ms. Gargir and Mr. Lang could concretely ascertain what a special education teacher (Ms. Gargir) and a regular military person (Mr. Lang) would earn, and therefore awarding damages for the impairment of their earning capacity was not speculative. By contrast, petitioner in the instant action can only guess as to whether he would earn a net profit from his business and, if he did, what that profit would be, whether he would ever experience a net loss, and how much the sales prices of his physical therapy business and his seminar and speaking engagement business would be.

The undersigned finds curious that petitioner was going to invest $250,000.00 of his own money in his proposed physical therapy business, yet his expert economist projected that in the first year of the physical therapy business's existence in 2010, petitioner was going to receive a net profit of $335,470.00 (discounted at a 12% rate for damages purposes to $299,526.00). Pet'r's Resp. at 16; Ex. 25, at 8. In other words, at the very beginning of petitioner's proposed business, he was already going to be an amazing success. The undersigned wonders, if petitioner's reputation as a physical therapist was so sterling, why his seminar and speaking engagement business was not similarly amazingly successful in the

15

past.He had quite a few years in which he had a net loss on his income tax returns for his business. If the basis of all the affiants' opinions of petitioner's undoubted future success was his past stellar reputation as a physical therapist, how does his failure to have uniform success in his seminar and speaking engagement business correlate with these affiants' opinions?

      The undersigned also finds curious petitioner's statement: "Just because [petitioner's] tax returns did not indicate a profit [for his seminar and speaking engagement business] does not mean that all of Mr. [J.T.]'s efforts and education did not put him in the position where his seminar business would start to become profitable as outlined in the economist [sic] report and as outlined in [sic] various experts who knew [J.T.] and also had physical therapy businesses as well as seminar businesses." Pet'r's Resp. at 26. Petitioner seems to be saying that just because his seminar and speaking engagement business was not uniformly profitable in the past does not mean that it would not be profitable in the future, as if experiencing a net loss over several years put him a position to experience a profit if only he had not incurred his vaccine injury. This makes no sense. Petitioner then analogizes his position as being akin to a medical or law student who goes through education and training but then gets injured and is not entitled to future lost wages. Id. This not a true analogy. A doctor or lawyer can earn a concretely ascertainable amount being employed at a hospital or a law firm, just as a prospective teacher or military employee has a known wage. Someone setting up his own physical therapy business and hoping finally to make a success of his seminar and speaking engagement business is living in the world of speculation.

      Petitioner seems to think that his economic expert's discount rate of 12%, which is quite high, resolves the argument that petitioner's net profit from a non-existent physical therapy business and a seminar and speaking engagement business which was never consistently profitable is not speculative but instead is reasonable. Pet'r's Resp. at 29. It is salutary that petitioner's economic expert recognizes the riskiness of his calculations, which he couches in the context of "smaller health services companies," but the high discount rate does not make the amount of $11 million for impaired earnings less speculative. Id. at 30.

      The only reasonable way to calculate loss of earnings capacity in this case is by basing that calculation on petitioner's known earnings in both his physical therapy employment and his former seminar and speaking engagement business, extended to a work-life expectancy of 70 years.

## CONCLUSION

      The undersigned rules in favor of respondent on the issue of how to calculate petitioner's loss of earnings capacity except for the terminus of petitioner's work-life expectancy.

**IT IS SO ORDERED.**

Dated: <u>October 13, 2015</u>  　　　　　　　　　　　　　　　　　<u>/s/ Laura D. Millman</u>
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Laura D. Millman
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Special Master